UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BRIAN E. HOGUE,<br><br>Plaintiff,<br><br>v.<br><br>CANYON COUNTY SHERIFF KIERAN DONAHUE, RUSSELL DONNELLY, TRAVIS ENGLE, SERGEANT HAMMOND, CORPORAL HAYES, CORPORAL STAUFFER, CORPORAL HOWELL, and JOHN DOE,<br><br>Defendants. | Case No. 1:25-cv-00212-DCN<br><br>**SUCCESIVE REVIEW ORDER BY SCREENING JUDGE** |

Plaintiff Brian E. Hogue, a prisoner in custody of the Idaho Department of Correction, has filed a second Amended Complaint subject to review by the Court to determine whether it should be dismissed under 28 U.S.C. §§ 1915 or 1915A. Dkt. 10. Plaintiff's claims arise from his incarceration at the Canyon County Detention Center (CCDC or jail). He brings (1) a First Amendment access to books claim asserting he should be permitted to order non-secular books into the jail, (2) a First Amendment Establishment Clause claim, asserting that the jail allows only Christian religious books to be ordered, (3) a Fourteenth Amendment Equal Protection Clause claim regarding the book policy, and (4) a First Amendment retaliation claim challenging his punishment for calling a jail employee an "idiot" in a grievance Plaintiff wrote about the book policy. After Plaintiff

filed his Complaint, he was transferred from CCDC to an Idaho Department of Correction prison facility. As a result, he has withdrawn all claims for injunctive relief and all claims against the "Defendant Canyon County Sheriff's Department." Dkt. 4.

**BACKGROUND AND REQUEST FOR MARTINEZ REPORT**

Plaintiff alleges that Canyon County Sheriff Kieran Donahue promulgated a CCDC policy requiring inmates to access reading materials only through a free e-book library, prohibiting inmates from ordering non-religious books from outside vendors, and allowing religious inmates to order only Christian religious books from outside vendors. Plaintiff admits he is not a Christian and follows no religion. Plaintiff asserts that the book policy and practices violated his First and Fourteenth Amendment rights when he was housed at the CCDC.

Plaintiff also asserts a First Amendment retaliation claim based on the following sequence of events. On April 2, 2025, Plaintiff submitted a grievance on the book policy. Dkt. 10 at 13. On April 3, 2025, Defendant Corporal Hayes was reviewing grievances and issued Plaintiff an "intent to discipline" report because Plaintiff had referred to a deputy by name and addressed the deputy as an "idiot." Plaintiff was disciplined by removal of all personal property and privileges for an unspecified period.

Plaintiff has asked the Court to order a Martinez report that would require Defendants to explain and provide more information about these policies. Dkt. 11. In *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978), before the trial court ordered an answer, it ordered prison officials to conduct an investigation of the incident and file a report to enable the court to decide jurisdictional issues and screen the claims under § 1915(a). *Id.*

at 319. The Ninth Circuit approved of *Martinez* reports in *In re Arizona*, 528 F.3d 652, 659 (9th Cir. 2008).

Plaintiff's First Amendment book claims are almost identical to a challenge to the Canyon County Jail book policy brought in *Laine v. Donahue*, No. 1:24-CV-00329-AKB, 2026 WL 1329564, at *1 (D. Idaho May 13, 2026). Plaintiff's First Amendment retaliation claim resting on a jail policy prohibiting disrespectful language in grievances is similar to those litigated in *Crist v. Ada County, et al.*, No. 1:24-CV-00180-DKG, 2026 WL 2137992, at *15–21 (D. Idaho July 24, 2026).

Rather than order preparation of a Martinez Report, the Court will ask the Canyon County attorneys to file a short response to this Order and to provide any documents or information particular to Plaintiff's facts not provided in *Laine* to address the "as applied" prong of the *Turner v. Safley* analysis (set forth below), including a copy of the book policy in effect at the time of Plaintiff's incarceration. The Court will provide Plaintiff with the Affidavit of Captain Patchett, outlining the CCDC book policy in *Laine* and the Memorandum Decision and Orders filed in *Laine* and *Crist*.

Plaintiff may file a reply that shows why his second Amended Complaint should not be summarily dismissed for failure to provide facts to meet all of the elements of his claims, and the Canyon County attorneys may file a sur-reply, if desired.

The Court gives notice that it intends to summarily dismiss Plaintiff's claims for the following reasons. The Court will first review the parties' filings in response to this Order before making a final decision.

## REVIEW OF SECOND AMENDED COMPLAINT

### 1. Standard of Law for Review of Complaint

The Court is required to review complaints filed by prisoners seeking relief against a governmental entity or officer to determine whether summary dismissal is appropriate. The Court must dismiss a complaint or any claim that states a frivolous or malicious claim, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§1915(e)(2)(B), 1915A(b).

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To state a claim under §1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

A complaint fails to state a claim for relief under Rule 8 of the Federal Rules of Civil Procedure if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 2. Discussion

The claims appear to be subject to dismissal for lack of supporting facts for the reasons that follow.

#### A. *First Amendment Book Claims*

The context of an inmate's exercise of free speech determines how much protection is afforded. Incarceration is a relevant context. In *Turner v. Safley*, 482 U.S. 78 (1987), the United States Supreme Court examined the free speech issue in the context of prison

officials prohibiting correspondence between inmates residing at different state institutions. The Court instructed the federal district courts to review four factors when a prison regulation or practice impinges on a First Amendment right of a prisoner: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "there are alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether "ready alternatives" at a "de minimis cost" exist, which "may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id*. at 89-93 (internal quotation marks omitted).

When considering a prison rule or regulation under *Turner*, a court must review both (1) the facial validity of the regulation under the four *Turner* factors and (2) whether the regulation was unconstitutional as applied to the inmate by examining "whether applying the regulation to th[e] speech . . . was rationally related to the legitimate penological interest asserted by the prison." *Hargis v. Foster*, 312 F.3d 404, 410 (9th Cir. 2002).

Plaintiff asserts that his First Amendment freedom of speech right was violated because he was not permitted to order secular books into the jail from an outside source. The book policy, as set forth in *Laine*, is as follows:

- CCDC allows one physical primary religious text and a supplemental text to ensure access when no eBook option is available and to allow for notating and highlighting the text. *Laine*, Dkt. 33-7 at 3.

*Laine*, No. 1:24-CV-00329-AKB, 2026 WL 1329564, at *4.

> - CCDC currently has a one-to-one inmate to tablet ratio, meaning each CCDC inmate is assigned a CTEL tablet. CCDC provides all inmates with an electronic tablet that has free access to more than 70,000 books, along with news media, legal research (FastCase), and other publications. CCDC's tablet provider — CTEL — currently utilizes a free, online, eBook library Project Gutenberg for eBook access. Project Gutenberg is continually expanding its eBook library. *Id*. at 2.

Dkt. 33-1 at 11 in Case 1:24-cv-00329-AKB, *Laine v. Donahue*.

A jail policy prohibiting the ordering in of non-secular books is subject to the *Turner v. Safley* test. *See Temple v. Oconee Cnty*., No. CA 6:13-144-JFA-KFM, 2014 U.S. Dist. LEXIS 124756, 2014 WL 4417702, at *5 (D.S.C. Sept. 8, 2014), *aff'd*, 595 F. App'x 246 (4th Cir. 2015) (finding a rational connection between a restriction on reading materials and the legitimate governmental interest in institutional safety and security, and finding that facility provided an alternative means of exercising First Amendment right where the jail provided legal materials through an institutional law library); *McCormick v. Reinkey*, No. 1:21-CV-00454-DCN, 2022 U.S. Dist. LEXIS 82630, 2022 WL 1422925, at *4 (D. Idaho May 5, 2022) (holding that "[p]rohibiting books being sent directly to inmates, but instead requiring them to be sent to the jail library, is reasonably related to the legitimate—indeed, the compelling—interest in jail security and safety.")

In *Laine*, United States District Judge Amanda K. Brailsford analyzed the CCDC publication policy, finding:

> Defendants have submitted evidence that CCDC inmates were using physical publications to smuggle and conceal drugs and weapons, to clog toilets and drains, and to sling bodily fluids between cells. For several reasons, this

> evidence is sufficient to meet Defendants' initial burden of showing that the Publications Policy is reasonably related to legitimate jail interests in safety and security.
>
> First, there is plainly a rational connection between transitioning to e-publications and the numerous harms caused by paper publications that officials sought to remedy. With paper publications no longer permitted at the jail, such publications cannot be used to cause the problems identified by jail officials.
>
> Second, Plaintiff has an alternative means of reading paper publications—accessing publications electronically through a tablet, as the new Publication Policy provides. Indeed, this alternative method of accessing publications is not only available, but it is also objectively superior. Instead of the five publications inmates were once able to access, inmates now have access to 70,000.
>
> Third, requiring CCDC to return to paper publications instead of electronic publications would have a profound and negative impact on the safety and security of the institution, on jail deputies, and on other inmates. The safety and security of the jail would be compromised because the problems identified by jail officials could easily resume. Jail deputies would be forced to return to (1) policing inmates who use paper publications in the same illegal or grotesque manner they did in the past and (2) engaging in the attendant disciplinary proceedings, which would intrude on their other responsibilities. And the other inmates would be forced to give up their present access to 69,995 publications.
>
> Finally, though alternatives to e-publications exist—specifically, the kind of paper publications the jail used to permit—they would cause the very same problems they once did. Defendants have met their initial burden of showing that the new Publications Policy is reasonably related to a legitimate governmental interest as required by *Turner* and, therefore, does not violate the First Amendment.

*Laine*, No. 1:24-CV-00329-AKB, 2026 WL 1329564, at *7. Mr. Laine did not adequately rebut Defendants' evidence to be able to proceed to trial. *Id*.

It appears that the policy facts asserted in *Laine* apply to Plaintiff's claims and that he has not pleaded sufficient facts to support a free speech claim regarding the CCDC book policy. Plaintiff will have one final opportunity to provide such facts after reviewing what the Canyon County attorneys provide. Preliminarily, it appears this claim is subject to dismissal for failure to state a claim.

**B. *Fourteenth Amendment Equal Protection Claim***

An equal protection claim may be established by showing that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008).

Plaintiff asserts that his equal protection rights were violated when Defendants permitted inmates to order in religious books, but "non-religious" inmates could not order in secular books. Plaintiff was notified that he must be comparing apples to apples to state a viable equal protection claim. All religious inmates must be treated similarly. All inmates (whether or not they are religious) who desire to order in seculars books must be treated similarly (either all can order in books, or none can order in books).

For example, in a similar Pennsylvania jail case, the federal district court reasoned as follows:

> [Plaintiff] … and other non-religious inmates within the RHU at Beaver County Jail [assert they were] were subject to disparate treatment because they were not allowed access to non-religious texts and extra jail visits while religious inmates were allowed access to religious texts and jail visits from religious advisers. In this case, Plaintiff's allegations are not sufficient to state an equal protection violation because he has

> failed to allege facts which would support a finding of disparate treatment. Plaintiff has not shown that inmates who hold religious beliefs are treated differently than those who do not. Plaintiff acknowledges that, pursuant to jail policy, all inmates housed within the RHU are allowed to have a religious text of their choice and all inmates are allowed a visit from a religious adviser. No inmate housed within the RHU is allowed to possess non-religious texts. In other words, all RHU inmates are treated the same without regard to their religious beliefs. Because Plaintiff has failed to meet this threshold requirement to satisfy an equal protection violation, his claim must be dismissed. Furthermore, as it is clear that leave to amend with respect to this claim would be futile, dismissal should be with prejudice.

*Mathis v. Manza*, No. CIV.A. 11-450, 2012 WL 443755, at *4 (W.D. Pa. Jan. 18, 2012) (footnoted omitted), *report and recommendation adopted*, No. CIV.A. 11-450, 2012 WL 442841 (W.D. Pa. Feb. 10, 2012), *aff'd sub nom. Mathis v. Monza*, 530 F. App'x 124 (3d Cir. 2013).

As explained in *Laine*, it is clear from the jail policy that all religious inmates are treated the same. Plaintiff incorrectly asserts that religious inmates may have only a “Bible” and another religious text. Instead, inmates may have one physical primary religious text of their choice and a supplemental text to highlight when no religious options of their choice are available among the 70,000 e-book offerings. Thus, all religious inmates are being treated alike under the policy; nothing shows that Christians are being favored over other religions, as Plaintiff suggests.

The second question is whether all inmates desiring non-secular materials are being treated alike. The policy provides that every inmate must access non-secular books in the form of e-books available from the 70,000-e-book collection. Nothing in the policy or

pleadings shows that some inmates are being permitted to have soft or hard copies of non-secular books, and others are required to access non-secular books from the e-book collection.

It appears that no Fourteenth Amendment equal protection claim is supported by the facts.

### C. *First Amendment Establishment Clause Claims*

A First Amendment Establishment Clause claim asserts that a law or regulation favors or disfavors a particular religion, sponsors religion, or affords a uniform benefit to all religions. A prison program violates the Establishment Clause if its primary effect is to advance or inhibit religion. *See Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 337-339 (1987)); *Larson v. Valente*, 456 U.S. 228, 238 (1982). The elements of an Establishment Clause claim are facts establishing that the challenged law or conduct does not have a secular purpose, that its principal or primary effect is to advance or inhibit religion, and that it creates an excessive entanglement of government with religion. *Lynch v. Donnelly*, 465 U.S. 668, 679 (1984).

The evidence provided in *Laine* does not show that only Bibles and other Christian books are offered as religious materials to CCDC inmates, regardless of their particular religious beliefs. There appears to be no factual basis for an Establishment Clause claim.

### D. *First Amendment Retaliation Claim*

Plaintiff's First Amendment retaliation claim is that Defendant Corporal Hayes disciplined him for referring to a deputy by name and addressing the deputy as an "idiot" in a grievance about the book policy. *Id*. at 13. Defendants Engle and Donnelly approved

the disciplinary sanction. As a result, Defendant Howell removed all Plaintiff's personal property and privileges.

Because pretrial detainees have not yet been convicted of the crime with which they are charged, the Fourteenth Amendment's Due Process Clause prohibits jail conditions that amount to punishment for that crime. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Pretrial detainees may, however, be disciplined for violating jail rules, so long as the detainee is given a hearing at which he may contest the charges. *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996).

1) <u>Elements of Retaliation Claim Unmet</u>

A retaliation claim requires the plaintiff to plead facts showing he can meet five elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action, (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015) (internal quotation marks omitted) (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005)).

Plaintiff has not pleaded facts supporting the fifth element of a retaliation claim. That is, even if Plaintiff establishes that his protected conduct was the cause of an adverse action by a jail official, Plaintiff's retaliation claim fails so long as the official's conduct reasonably advanced a legitimate governmental interest. *See Turner*, 482 U.S. at 89. The "plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir.

1995).

In *Bradley v. Hall*, 64 F.3d 1276, 1281–82 (9th Cir. 1995),[1] the Ninth Circuit Court of Appeals held that "prison officials may not punish an inmate merely for using 'hostile, sexual, abusive or threatening' language in a written grievance." In *Brodheim v. Cry*, 584 F.3d 1262, 1264 (9th Cir. 2009), the Ninth Circuit Court held that an officer's warning to an inmate that he should be careful what he writes in a grievance "cannot escape constitutional scrutiny by generally citing a legitimate penological interest" in "security and discipline." 584 F.3d at 1266, 1273. But *Bradley* and *Brodheim* did not address other legitimate penological goals that might be advanced by such a policy. Thus, there is no clearly established law on whether an abusive language policy is reasonably related to *other* legitimate jail interests.

In *Crist*, jail officials showed that the Ada County Jail's abusive language policy advanced the legitimate correctional interests of promoting staff morale, mental health, and retention. The *Crist* Court determined that, under the first *Turner* factor, there was a rational connection between the policy and the legitimate penological interest asserted. A "jail unquestionably has legitimate interests in 'promoting a non-hostile work environment' for jail staff, *Reynolds v. Quiros*, 25 F.4th 72, 85 (2d Cir. 2022), and in ensuring the morale of jail employees, *Cal. Coal. for Women Prisoners*, 723 F. Supp. 3d at 745." *Crist v. Ada County, et al.*, No. 1:24-CV-00180-DKG, 2026 WL 2137992, at *17.

The *Crist* Court further found:

> The jail also has a legitimate interest in safeguarding the

[1] *Bradley* was overruled on other grounds by *Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001).

> mental health of jail employees, who should not have to be threatened, harassed, or abused at work. *Cal. Coal. for Women Prisoners*, 723 F. Supp. 3d at 745 ("It is beyond dispute that the government's goal[ ]—*to protect staff* ... —[is] legitimate.") (emphasis added). The jail has an additional legitimate interest in ensuring the retention of competent employees, which helps to ensure professionalism in jail staff.
>
> Defendants have submitted evidence that "[h]arassing language directed at staff can damage morale." *First Am. Ivie Decl*. ¶ 7. Disciplining inmates for abusive name-calling in a grievance, particularly where the grievance also presents no legitimate issue for resolution, is rationally connected to the legitimate penological interest in preventing inmate behavior that may "worsen staff morale" or that may cause jail employees to suffer emotional trauma or to leave their jobs. *Cal. Coal. for Women Prisoners*, 723 F. Supp. 3d at 745. Additionally, disciplining an inmate "who is interfering with ... staff morale goes to the essence of [jail] management." *Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir. 1995) (transfer of inmate to preserve morale); *see also Hadden v. Howard*, 713 F.2d 1003, 1006–07 (3d Cir. 1983) ("If it is possible for inmates maliciously to lie and maliciously to show disrespect toward prison staff members, merely by doing so within the context of filing an inmate complaint, then serious problems of staff morale and prison discipline may reasonably be expected to arise.").

*Id*.

Under the second *Turner* factor, the *Crist* Court found Plaintiff had an obvious alternative means of exercising his right to petition the government for redress—he could simply have omitted the insulting and abusive name-calling. *Id*. Under the third *Turner* factor, the *Crist* Court found that permitting insulting and abusive language would not impact inmates, but would worsen employee morale, mental health, and retention. *Id*. (citing *Turner*, 482 U.S. at 90). The fourth *Turner* factor weighed in favor of upholding the policy because, although permitting such language is a ready alternative to prohibiting

it, the cost of doing so—in terms of staff morale, mental health, and retention—would be more than *de minimis*. *Id*.

Similarly, the United States District Court for the Eastern District of Washington found that an abusive language prohibition was reasonably related to the legitimate jail interests in rehabilitating inmates and preserving employee morale. *Richey v. Duncan*, No. 2:23-CV-00050-SAB, 2024 WL 3432363, at *6 (E.D. Wash. July 16, 2024) (unpublished). The *Richey* court explained:

> Individuals who become incarcerated often have difficulty dealing with interactions with others. Many of them have never had the opportunity in life to learn respectful discourse or the personal discipline to follow rules. Part of the goal of incarceration is to teach incarcerated people respectful and effective communication skills so that they may someday be able to participate in society.... Regardless of who reads the grievances, the behavior is negative and it is imperative that the Department be permitted to reinforce new habits of respectful behavior and to punish negative behavior as part of the rehabilitation process.
>
> In addition, many incarcerated individuals ended up in prison because they lacked respect for rules in general and for authority figures. Respect for rules and being respectful of authority is not just a skill needed in prison, it is part of the life skills a person needs to function in everyday life outside of a prison as well. Allowing an incarcerated person to ignore prison rules when they file grievances and to use harassing and abusing language discourages respect for authority. This is also something that cannot be solved by having someone who is not the target of the harassment read the grievances. .... Staff morale also suffers as the result of being harassed in the workplace.... Prison should be a place of respectful interactions and it should be a safe environment for all.

*Id*. at *5–6.

Based on all of the foregoing, this Court preliminarily concludes that the CCDC

abusive language policy upon which Plaintiff's retaliation claim is based is reasonably related to obvious legitimate correctional interests in promoting staff morale, mental health, and retention and rehabilitating inmates. Therefore, even if Plaintiff was charged with a disciplinary offense for calling a deputy an "idiot" in a grievance, Plaintiff's claim fails on the fifth element. The Court will permit the parties to pinpoint the particular reasons for the CCDC policy in response to this Order.

2) Application of Qualified Immunity

A screening judge may dismiss a claim on qualified immunity grounds under 28 U.S.C. § 1915(e)(2)(B)(iii) if it is clear from the complaint that the plaintiff can present no evidence that could overcome a defense of qualified immunity. *Chavez v. Robinson*, 817 F.3d 1162, 1169 (9th Cir. 2016), *as amended on reh'g* (Apr. 15, 2016).

The doctrine of qualified immunity protects government officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). True to its dual purposes of protecting state actors who act in good faith and redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotation marks omitted).

A qualified immunity analysis consists of two prongs: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the [defendant's] conduct violated a constitutional right"; and (2) whether that right was clearly

established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). A district court may exercise its discretion to analyze the qualified immunity prongs in either order, or resolution of the second prong may obviate the need to address the first. *Pearson*, 555 U.S. at 236.

The law on qualified immunity does not require employees to choose between following a law, ordinance, or a government policy and being sued by an inmate. *Cf. Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994) ("where a police officer has probable cause to arrest someone under a statute that a reasonable officer could believe is constitutional, the officer will be immune from liability even if the statute is later held to be unconstitutional"); *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999) (when a public official acts in reliance on an ordinance, that official is entitled to qualified immunity unless the ordinance is "patently violative of fundamental constitutional principles").

To determine whether the right at issue was clearly established, the Court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged violation. Determining whether a right is clearly established requires courts to define the right specifically, rather than as a "broad general proposition." *Saucier*, 533 U.S. at 201. The Supreme Court has repeatedly instructed courts "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal quotation marks and citation omitted). A court may deny an official qualified immunity only if the plaintiff can "*identify a case* where an officer taking similar actions in similar circumstances was held to have violated the

Constitution." *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (per curiam) (emphasis added) (internal quotation marks and alteration omitted).

The Ninth Circuit has not squarely addressed whether, considering only the *Turner* factors as the Supreme Court has instructed, a jail regulation like the abusive language policy is reasonably related to preserving the morale, mental health, and retention of jail staff or to promoting inmate rehabilitation. In response to this Order, the Canyon County attorneys should briefly address any legitimate correctional interests (different from those addressed in *Bradley* and *Brodheim*) served by its abusive language prohibition and how the prohibition of abusive language is reasonably related to those interests. Plaintiff should address the *Turner* factors, as well.

## ORDER

**IT IS ORDERED:**

1. The Court gives notice that it intends to summarily dismiss Plaintiff's claims for the reasons set forth above, unless Plaintiff can show that he has facts supporting all elements of his causes of actions in the second Amended Complaint. The Court will review the parties' filings in response to this Order before making a final decision.
2. Plaintiff's Motion for a Ruling on Objection (Dkt. 12) is GRANTED in part, to the extent that this Order is issued.
3. Plaintiff's Motion for a Court Ordered Martinez Report (Dkt. 11) is DENIED.
4. The Canyon County attorneys are requested to file a response to this Order and provide any documents particular to Plaintiff's facts within **45 days** after entry of this Order. Plaintiff may file a reply that shows why his second amended Complaint

should not be summarily dismissed for failure to provide facts to meet all of the elements of his claims within 45 days after Defendants' response is filed. The Canyon County attorneys may file a sur-reply within 14 days of Plaintiff's reply, if desired.

5. The Clerk of Court shall provide an electronic copy of this Order and the Amended Complaint (Dkt. 10) to Attorney Benjamin Thomas Cramer, who represents Canyon County, at his registered CM/ECF addresses. Mr. Cramer, or another attorney for the Canyon County Defendants, should file a notice of limited appearance in due course.

DATED: September 21, 2026

David C. Nye
U.S. District Court Judge